THE MORINGEN.[1]

(District Court, E. D. Pennsylvania. December 15, 1899.)

CHARTER PARTY—STIPULATIONS INCONSISTENT WITH LIEN.
    Where a charter party provides for the payment of a fixed sum, to be made in advance, and at a particular place, such stipulation will be held to be an implied waiver of the charterer's lien for unpaid arrears of hire, and payment thereof cannot be demanded elsewhere and at other times.

In Admiralty. This was a libel for the injury suffered by the consignee of a cargo carried on a chartered vessel, the master of which, acting under instructions from the owners, refused to dock her upon arrival, the delay resulting in another cargo, belonging to a rival of the libelant, being first discharged, and thereby securing the market. The facts are very fully recounted in the opinion of the court. Decree for libelant.

Horace L. Cheyney and John F. Lewis, for libelant.
Henry R. Edmunds, for respondent.

McPHERSON, District Judge. In December, 1895, Dumois & Co., who are importers and wholesale dealers in foreign fruits, chartered the steamship Moringen for a period of five months from March 15,

---

[1] Reported by Arthur G. Dickson, Esq., of the Philadelphia bar.

1896, at the hire of £405 British sterling per calendar month, "payment of said hire to be in cash at New York at the rate of $4.85 per pound sterling, half-monthly in advance, from the date of delivery of steamer." The vessel was delivered on March 23d at Gibara, Cuba, to Guarch & Co., who are shippers of fruit at that port, and received the boat for the charterers. She made two voyages to New York, carrying fruit consigned by Guarch & Co. to Dumois & Co., and afterwards made three or four voyages to Philadelphia, carrying fruit consigned by the same shippers to Fox, the libelant, who was a commission agent in this city, and received the fruit for sale on account of Guarch & Co. These voyages to Philadelphia were made under a verbal contract between the charterers and Guarch & Co., by which the ship was to carry cargo for Guarch & Co., and they were to pay to Dumois & Co. the hire named in the charter party, in the same manner (half-monthly in advance) and at the same place (the city of New York). As Mr. Dumois testified, the amount of freight to be paid was not measured by the quantity of cargo actually shipped, but Guarch & Co. were to ship what they pleased to Fox, and Fox was to pay the charter hire to Dumois & Co. In his own words: "Every fifteen days the charter money was to be paid. * * * The one to whom [the cargo] was consigned would take my place,—to pay the money to me, and for me to remit it to the owner."

On May 27th, Guarch & Co. consigned to Fox a cargo of bananas, the bill of lading stating that freight was to be paid "as per charter party"; and on the evening of June 8th the ship arrived at Philadelphia, and cast anchor in the Delaware river, opposite the dock at which the fruit was to be unloaded. Fox sent out a tugboat to bring the vessel in, but the captain of the steamship refused to allow his boat to be docked, declaring that on his way up the river he had been notified by Dumois & Co. not to dock the ship until further order. At this time two installments of hire were unpaid. Not long before the vessel arrived, there had been some controversy about these arrears between Fox and Dumois, the result of which had left the charterers in some doubt whether payment would be made. In consequence of this doubt, they gave the captain the order above referred to, intending to enforce payment thereby, but they did not inform the captain why the order had been given, nor what its object was. He carried out the order without giving any reason, and without making any demand for money; but Fox correctly supposed that the difficulty was caused by his failure to pay the last two installments of hire, and accordingly, between 8 and 9 o'clock of the same evening, he offered the captain two certified checks, each for $957.58,—this being the exact amount of a semimonthly installment. The checks were properly drawn and indorsed, and would have been paid upon presentation at the Camden National Bank in this city. The captain made no objection on the ground that checks, and not cash, were offered, but refused to accept payment for the express reason that his orders were positive, and that he had no authority to receive the money. Fox thereupon gave notice that another ship, carrying bananas consigned to Dumois & Co., had just arrived, and would supply the local market, to his own injury, if he were not allowed a fair chance to compete;

declaring that he would hold the ship liable if she were not at the dock early the next morning. The captain continued to refuse, and the situation remained unchanged until about noon the next day, when Mr. Dumois came to Philadelphia from New York,—where his firm has its principal office,—and the difficulty was settled. Dumois presented a bill for $1,149.11, being "for half-month's hire of S. S. Moringen, May 21st to June 6th," less commission, $957.58, and "3 days' hire June 6–9," $191.53; these two sums making the amount demanded. The money was paid, and the ship was docked. The cargo could not be fully discharged before noon of the following day, and the libelant avers that this delay enabled the other vessel to supply the local market, and made it necessary to ship the bananas of Guarch & Co. to other points, thus compelling them to dispose of the fruit at a pecuniary disadvantage.

Upon this state of facts I think the libelant is entitled to recover for such injury as may have been done. The terms of the contract between Dumois & Co. and Guarch & Co. are sufficiently clear. The latter firm did not have control of the ship under a subcharter, but they were freighters, having a right to load the ship upon the payment of a specified sum. But the amount of this sum was not to be determined by the quantity of cargo carried; neither was payment to be made only after the arrival of the cargo, and at the port of destination, but the hire was a fixed sum, whether much or little was carried; and payment was to be made semimonthly in advance, and the place of payment was the city of New York. I think it is well settled that under such a contract Dumois & Co. waived the right to hold the cargo for arrears of hire. Having agreed that the hire should be paid semimonthly in advance, and at a particular place, they gave up the inconsistent right to demand payment elsewhere and at other times. The point has been expressly decided, both in England and in the United States, and need not be further discussed. An examination of the subject, both upon principle and authority, will be found in Raymond v. Tyson, 17 How. 53, 15 L. Ed. 47; How v. Kirchner, 11 Moore, P. C. 21; and Kirchner v. Venus, 12 Moore, P. C. 361.

The case will be referred to a commissioner, to determine what damage, if any, has been suffered by the libelant, and to report an appropriate decree.